**Paul GILMAN, Plaintiff**

v.

**C & S WHOLESALE GROCERS, INC., Defendant**

No. Civ. A. 99–30224–MAP

United States District Court,
D. Massachusetts.

Sept. 28, 2001.

Richard A. Mulhearn, Richard Mulhearn & Associates, P.C., Worcester, for Paul Gilman, Plaintiffs.

Mary J. Kennedy, Bulkley, Richardson & Gelinas, Springfield, for C & S Wholesale Grocers, Inc., Defendants.

*MEMORANDUM AND ORDER REGARDING REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT* (Docket No. 17)

PONSOR, District Judge.

Upon *de novo* review, the Report and Recommendation of Magistrate Judge Kenneth P. Neiman, dated April 23, 2001 (Docket No. 27) recommending that defendant's Motion for Summary Judgment (Docket No. 17) be denied, is hereby ADOPTED. Although the state of the law is not crystal clear, the Magistrate Judge's assessment seems the most reasonable. The better view of this developing area of the law supports the Magistrate Judge's interpretation of the impact of Mass.Gen. Laws ch. 152, § 75B(1) on Mass.Gen.Laws ch. 151B. Moreover, the facts viewed in the light most favorable to the plaintiff would support the conclusion that plaintiff was "regarded" by defendant as having a substantially limiting impairment, and the conclusion that plaintiff was discharged for opposing a discriminatory practice. Admittedly, the issues are close, both as to the law and as to the facts. Nevertheless, at this stage, the court cannot say that plaintiff does not deserve his day in court.

For the foregoing reasons, the defendant's Motion for Summary Judgment is hereby DENIED. The clerk will set the case for a status conference.

It is So Ordered.

*REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 17)*

NEIMAN, United States Magistrate Judge.

Paul Gilman ("Plaintiff") brings this employment discrimination case against his former employer, C & S Wholesale Grocers, Inc. ("Defendant"). Plaintiff claims that, not unlike a scene from *The Scarlet Letter*, he was unlawfully fired for refusing to wear a bright orange vest identifying him as an injured worker.[1] The complaint's two counts allege violations of the Massachusetts anti-discrimination statute, Mass.Gen.L. ch. 151B ("chapter 151B"), and a portion of the Massachusetts Workers Compensation Act ("WCA"), Mass. Gen.L. ch. 152, § 75B. Defendant's motion for summary judgment has been referred to the court for a report and recommendation. *See* 28 U.S.C. § 636(b). For the reasons indicated below, the court will recommend that the motion for summary judgment be denied.

## I. BACKGROUND

The facts are stated in a light most favorable to Plaintiff, the party opposing summary judgment. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 257 (1st Cir.1999). In 1996, Plaintiff was employed as a dock worker at Defendant's Hatfield, Massachusetts, facility. (Statement of Material Facts of Record as to Which Plaintiff Contends There is a Genuine Issue to be Tried ("Plaintiff's Facts")

---

1. "[T]hey have doomed Mistress Prynne to stand only a space of three hours on the platform of the pillory, and then and thereafter, for the remainder of her natural life, to wear a mark of shame upon her bosom." Nathaniel Hawthorne, The Scarlet Letter 45 (Norton Critical ed., 3d ed., W.W. Norton & Company, Inc.1988) (1850).

(attached to Docket No. 21: Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Brief")) ¶ 1.) On May 24, 1996, Plaintiff suffered a work-related injury to his chest and was taken by ambulance to a hospital. (*Id.* ¶¶ 2, 5.) According to Plaintiff's shift manager, there was nothing about the injury that would suggest that Plaintiff needed to be retrained. (*Id.* ¶ 4.)

At all relevant times, however, Defendant had a Safety Retraining Program for, among others, employees such as Plaintiff who had less than two years' seniority and who had sustained work-related injuries. (See Docket No. 19: Affidavit of Mary J. Kennedy in Support of Defendant's Motion for Summary Judgment ("Kennedy Affidavit"), Exhibit A.)[2] The ostensible purpose of the program was to improve employees' safe work habits and reduce the amount of work-related injuries and, thereby, reduce costs associated with injury-related claims. (Plaintiff's Facts ¶ 38.)[3]

The Safety Retraining Program was divided into two parts: a one to two-week classroom portion followed by a ninety-day observation period. (Kennedy Affidavit, Exhibit A.) During the classroom portion, program participants, who received two-thirds of their regular pay up to a maximum of $8.00 per hour, reviewed Defendant's safety rules and participated in retraining sessions on lifting, operating equipment, proper stretching and exercise. (*Id.*) After completing the classroom portion, program participants returned to their regular jobs, at full pay, and were observed for the next ninety days by su-

pervisors and other safety personnel. (*Id.*) During this time, program participants were required to wear orange vests in order to "enable[ ] supervision and safety personnel to closely observe their work habits and to assist them in performing their jobs more safely." (*Id.*) They were also required to report to their supervisors at the beginning of each shift so that the supervisors could "observe them stretching properly" and verify that they "[were] wearing the orange vest[s]." (*Id.*) Supervisors and managers had weekly or monthly meetings at which the program was discussed. (Plaintiff's Facts ¶ 21.)

Plaintiff returned to work on or about June 5, 1996, and was asked to sign a Safety Retraining Form. (See Plaintiff's Facts ¶¶ 6, 8; Kennedy Affidavit, Exhibit B.) The form verified that Plaintiff would be paid up to two-thirds of his regular pay while attending the two-week retraining program and that Plaintiff would have to wear the safety vest during the retraining and "beginning on [his] return to light duty for a period of three months." (Kennedy Affidavit, Exhibit B.) The form also stated that, "[w]hile [Plaintiff was] wearing the vest," he would be required to participate in daily stretching exercises. (*Id.*)

During the two-week class, which was conducted in an open area, vest-wearing program participants, including Plaintiff, were harassed by other workers. (Plaintiff's Facts ¶¶ 12, 14.) These other workers would laugh and pick on them, saying things like "Look at the idiots, guess you got hurt!" (*Id.* ¶ 12.) Plaintiff did not

---

2. Other employees required to participate in the program included (1) those with more than two years seniority who had a work-related injury and were recommended by a "facility accident review committee," (2) those who had more than one injury within a twelve month period, (3) those who caused a work accident involving two or more individ-

uals, and (4) those who had "demonstrated they cannot perform there [sic] job functions in a safe manner and need additional training." (*Id.*)

3. Defendant's counsel reported at oral argument that the Safety Retraining Program was discontinued in the year 2000.

remember all of the remarks because he "tried to block out most of it." (*Id.*)

Many program participants, including Plaintiff, complained about the vests. (*Id.* ¶¶ 13, 15–18.) When Plaintiff lamented to the instructor that he did not want to wear the vest, the instructor said it was required. (*Id.* ¶ 13.) One supervisor testified that he did not like the program because he would have to deal "face-to-face with a bunch of pissed off employees." (*Id.* ¶ 17.) This same supervisor acknowledged that the vests resulted in negative attention to the program participants. (*Id.* ¶ 20.) Even so, he was unaware if an exception was ever made for an employee who did not want to wear the vest. (*Id.* ¶ 40.) He also stated that he and other supervisors would know who was supposed to be wearing a vest because they only had seventy to one hundred people working for them; they knew "who was who" and "what their names were." (*Id.* ¶ 25.)

After completing the two-week class, Plaintiff returned to "full duty" work at his regular job. (Plaintiff's Facts ¶ 27.)[4] He did not, however, wear his vest, believing that the form he had signed required the vest only if he returned to "light duty" work. (*Id.* ¶¶ 28, 29.) In any case, on August 16, 1996, Plaintiff was confronted by an assistant manager who told Plaintiff, in front of his co-workers, "By the way, Gilman, you're supposed to be wearing the god-damned vest." (*Id.* ¶ 30.) After Plaintiff refused to put on the vest, he was sent to meet with the shift manager and another supervisor. (*Id.*) Still refusing to wear the vest, Plaintiff was fired. (*Id.* ¶ 32.)[5]

After Plaintiff filed his two-count action in state court, Defendant removed the case here. Count I alleges violations of chapter 151B, presumably sections 4(4) and 4(16), and Count II alleges a violation of section 75B of the WCA, presumably subsection (2) of section 75B of Chapter 152. Presently before the court is Defendant's motion for summary judgment.

## II.  SUMMARY JUDGMENT STANDARD

A court may grant summary judgment pursuant to FED.R.CIV.P. 56(c) if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995). A "genuine" issue is one "that a reasonable jury could resolve ... in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). *Accord United States v. One Parcel of Real Property, Great Harbor Neck, New Shoreham, R.I.*, 960 F.2d 200, 204 (1st Cir.1992).

Not every genuine factual conflict, however, necessitates a trial. " 'It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.' " *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 448 (1st Cir. 1997) (quoting *Martinez v. Colon*, 54 F.3d 980, 983–84 (1st Cir.1995)). At bottom,

---

4.  Plaintiff also missed work from June 27 through July 5, 1996, for medical evaluations of non work-related dizziness and blackouts. (Plaintiff's Facts ¶ 7.)

5.  For purposes of this motion, the court, like Defendant, accepts Plaintiff's description that he was "fired," even though Defendant's termination form states that he "[q]uit" because he "[r]efused to wear [the] vest." (See Plaintiff's Facts ¶ 34.)

matters of law are for the court to decide at summary judgment. *Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996).

### III. DISCUSSION

Before discussing the substantive summary judgment issue, the court will address a discovery question raised by Plaintiff in his opposition to Defendant's motion, namely, whether Plaintiff is entitled to the names of employees redacted by Defendant from a list of participants in the Safety Retraining Program and further discovery with respect thereto.

### A. DISCOVERY REGARDING THE LIST

During discovery, Defendant produced a list of 320 program participants. (See Plaintiff's Facts ¶ 39 and Exhibit 6.) Thirty-nine of those employees, approximately twelve percent, were terminated within several months of their work injury. (*Id.* ¶ 39.) In addition, eighteen of those employees, approximately six percent, were not required to wear vests. (*Id.*) Over Plaintiff's objection, Defendant redacted the names of all employees on the list. (See Plaintiff's Brief at 9–10.)

In the "facts" sections of his brief, Plaintiff suggests that information in the list raises "serious questions" that he "should be able to explore through discovery by contacting [the listed] individuals to learn the circumstances of their termination or the circumstances of their being excused from the vest requirement." (Plaintiff's Brief at 10.) Plaintiff raises this issue now, he claims, because District Judge Michael A. Ponsor suggested at the pretrial conference that he "set forth in his Opposition how the Defendant's summary judgment motion should be denied or deferred based on Defendant's refusal to provide the further information sought." (*Id.* at 9.) However, neither Judge Ponsor's scheduling order of September 12, 2000, (Docket No. 16), nor the accompanying clerk's note, (Docket No. 15), says anything of the sort.

Although Plaintiff may be attempting to invoke Fed.R.Civ.P. 56(f), he has failed to submit the necessary affidavit. *See* Fed. R.Civ.P. 56(f). *See also Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985, 988 (1st Cir.1988) (indicating that a Rule 56(f) invocation "should articulate some plausible basis for [Plaintiff]'s belief that specified 'discoverable' material facts likely exist which have not yet come in from the cold" and show that facts, if obtained, will "suffice to engender an issue both genuine and material"). For that reason alone, the court would be inclined to reject any attempt to delay a ruling on Defendant's summary judgment motion. More importantly, however, the court does not believe that any further discovery is necessary at this time for Plaintiff to defeat Defendant's motion. Whether some additional limited discovery should be permitted prior to trial is best left to another day.

### B. SUMMARY JUDGMENT

Defendant's motion for summary judgment asserts, in essence, that no reasonable jury could conclude (1) that Plaintiff is a "qualified handicapped person" or (2) that Plaintiff was terminated for opposing a discriminatory practice. In the court's view, neither argument is sufficient to entitle Defendant to summary judgment on any of the three separate causes of action raised in the complaint: section 4(4) of chapter 151B, section 4(16) of chapter 151B and section 75B(2) of the WCA.[6]

---

6. Defendant also argues that no reasonable jury could conclude that a "hostile" work environment existed. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126

### 1. Whether a Reasonable Jury Could Conclude That Plaintiff is a "Qualified Handicapped Person"

Defendant asserts that a threshold issue with respect to all three claims is Plaintiff's alleged status as a "qualified handicapped person." While Plaintiff's status as a "qualified handicapped person" is important, it is not, in the court's view, dispositive of all three claims. It appears to apply only to that portion of Count I alleging a violation of Mass.Gen.L. ch. 151B, § 4(16) which, in pertinent part, makes it unlawful "[f]or any employer ... to dismiss from employment ... or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person ...." Mass.Gen.L. ch. 151B, § 4(16).[7]

#### a. Traditional analysis

But for a major exception discussed below, a "qualified handicapped person" is traditionally defined as "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap." Mass.Gen.L. ch. 151B, § 1(16). Thus, as applied here, the traditional stat-

utory inquiry has two components: whether Plaintiff is even handicapped and, if so, whether he could perform the essential functions of his job with or without reasonable accommodation. Defendant does not dispute that Plaintiff could perform the essential functions of his job, but argues that Plaintiff is simply not "handicapped."

According to chapter 151B, "[t]he term 'handicapped person' means any person who has a handicap." Mass.Gen.L. ch. 151B, § 1(19). "Handicap," in turn, is defined as "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment ...." Mass.Gen.L. ch. 151B, § 1(17). The term "major life activities" means functions such as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." Mass.Gen.L. ch. 151B, § 1(20).

In the court's view, it would be difficult for a reasonable jury to conclude that Plaintiff's condition substantially limited a major life activity. Indeed, Plaintiff has presented no evidence that his injury prevented him from walking, seeing, hearing,

---

L.Ed.2d 295 (1993) (indicating that to make hostile work environment claim, harassment must be severe or pervasive enough to create an objectively abusive work environment). If Plaintiff were indeed making such a claim, the court, cognizant of the high threshold for such claims, would agree with Defendant. However, Plaintiff indicated at oral argument that he was not making a hostile environment claim. He merely explained that the hostility he encountered was part of the damages he suffered as a result of Defendant's allegedly discriminatory policy.

7. Section 75B(2) of chapter 152, upon which Plaintiff also stakes a claim, refers in its title to "[q]ualified handicapped persons," but states in substance and without reference to handicap status only that "[n]o employer ...

shall discharge ... or in any other manner discriminate against an employee because the employee has exercised a right afforded by this chapter ...." Mass.Gen.L. ch. 152, § 75B(2). Similarly, the other portion of chapter 151B, upon which Plaintiff also relies to make a claim, section 4(4), applies to all persons regardless of handicap status. See Mass.Gen.L. ch. 151B, § 4(4) (making it unlawful "[f]or any ... employer ... to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter ..."). Thus, the present action does not, as Defendant alleges, completely rise or fall on Plaintiff's status as a "qualified handicapped person."

speaking, breathing or learning. It is, however, a closer question as to whether Defendant "regarded" Plaintiff as being handicapped, particularly as his condition affected his ability to work. After all, Defendant required Plaintiff to participate in a safety training program—even though he was cleared for work after receiving worker's compensation—and paid him no more than eighty percent of his previous average hourly wage during his participation in the classroom portion of the program. Nevertheless, Plaintiff conceded at oral argument that he would be hard pressed to demonstrate that he is a "qualified handicapped person" under the traditional analysis. Accordingly, the court turns, as does Plaintiff, to a major exception to the traditional definition of a "handicapped person."

b. *Exception: Section 75B(1)*

In support of his opposition to Defendant's motion, Plaintiff relies on what he describes as an expanded definition of "qualified handicapped person" derived from the WCA. According to section 75B(1) of chapter 152, "[a]ny employee who has sustained a work-related injury and is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a job with reasonable accommodations, shall be deemed to be a qualified handicapped person under the provisions of chapter [151B]." Mass. Gen. L. ch. 151, § 75B(1). Having sustained a work-related injury and being capable of performing the essential functions of his job, Plaintiff asserts, he is automatically "deemed" by section 75B(1) to be a qualified handicapped person for purposes of chapter 151B. In response, Defendant, citing two unreported Massachusetts Superior Court decisions, maintains that nothing in section 75B(1) creates any rights or remedies independent of those set forth in chapter 151B.

Neither party has cited any Massachusetts appellate decision construing section 75B(1). Indeed, the Supreme Judicial Court has specifically declined to address the applicability of section 75B(1) to a chapter 151B claim of handicap discrimination. *See Dartt v. Browning–Ferris Indus., Inc.*, 427 Mass. 1, 691 N.E.2d 526, 536 n. 30 (1998). In *Dartt*, the plaintiff was unable to work for more than two years while he was undergoing two operations for work-related injuries. *Id.* at 536. This "slight" evidence, the Supreme Judicial Court ruled, was sufficient for a jury to conclude that the plaintiff was "regarded" by his employer as having a substantially limiting impairment pursuant to the traditional analysis. *Id.* (citing Mass. Gen.L. ch. 151B, § 1(17)). Accordingly, the court refused to reach the alternative section 75B(1) definition of the term "qualified handicapped person." *See id.* at 536 n. 30 (citing *Hallgren v. Integrated Fin. Corp.*, 679 N.E.2d 259, 259 n. 2 (Mass.App. Ct.1997) (also declining to consider section 75B(1) in "temporary disability" action where no argument made as to that section's application)).

Given this state of the law, the trial court in the case at bar might well consider certifying an appropriate question to the Supreme Judicial Court once discovery is complete. *See Nuccio v. Nuccio*, 62 F.3d 14, 17–18 (1st Cir.1995) (ordering certification to state supreme court where there is no clear, controlling precedent); *Fernandez v. Chardon*, 681 F.2d 42, 54 (1st Cir.1982) (certification particularly appropriate in light of "novel and unsettled" questions of state law), *aff'd on other grounds*, 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983). Short of that, the trial court may prefer to predict how the Massachusetts courts would evaluate Plaintiff's

section 75B(1) argument. For the moment, this court has taken the latter approach.

■] In a recent unpublished decision, to which neither party refers, the Massachusetts Appeals Court found that an employee injured at work, who would have been able to perform her job with reasonable accommodation for her injury, could be considered a "qualified handicapped person" as traditionally defined by Mass. Gen.L. ch. 151B, § 1(16). *Everett Indus., Inc. v. Mass. Comm'n Against Discrimination,* 735 N.E.2d 1271, 2000 WL 1476321, at *5 (Mass.App.Ct. June 29, 2000). "Furthermore," the court stated, the employee "is presumed to be a qualified handicapped person pursuant to [section] 75B(1)." *Id.,* at *5 n. 13. In this court's opinion, the Appeals Court thereby implies that section 75B(1) ought to be read so as to deem individuals suffering work related injuries, without more, to be qualified handicapped persons under 151B, at least for the period of time that their status under the workers compensation law can fairly be read to influence their treatment by others.

Defendant's reliance on *Robinson v. Electro Sales Co.,* 1998 WL 1184175 (Mass.Super.Ct. Aug. 31, 1998), one of the two unreported Superior Court decisions, appears misplaced. There, the court merely held that section 75B(1) did not constitute an additional cause of action for handicap discrimination independent of chapter 151B so as to provide a means of avoiding chapter 151B's six month statute of limitations. *See Robinson,* 1998 WL 1184175, at *5. Here, by contrast, there is no limitations issue. In fact, *Robinson* states that section 75B(1) "specifies that injured workers *will,* if they are capable of performing the essential functions of their jobs, be protected by the statute prohibiting handicap discrimination in the work-

place." *Id.* (emphasis added). By using the word "will," *Robinson* arguably supports Plaintiff's, not Defendant's, reading of section 75B(1).

The other unreported Superior Court decision, *Freire v. First Nat'l,* 1998 WL 1181751 (Mass.Super.Ct. July 22, 1998), provides stronger ammunition for Defendant, but this court is disinclined to accept its reasoning. *Freire* discussed section 75B(1) as a potentially alternative basis for the plaintiff's claim that she was handicapped within the meaning of chapter 151B because she suffered a work-related injury for which she collected workers' compensation benefits. *Freire,* 1998 WL 1181751, at *8. Echoing the "major life activities" language of Mass.Gen.L. ch. 151B, § 1(17), the court rejected Plaintiff's argument, holding that "[t]he clear purpose of [section 75B(1) ] is to establish that an injury which substantially impairs a major life activity is not excluded as a handicap under Chapter 151B merely because it was sustained on the job." *Id.* Section 75B(1), the court continued, "does not ... transform all work-related injuries, regardless of how minor their effects, into handicaps protected under [chapter 151B]." *Id.* The court cited no authority for this proposition.

This court agrees with Plaintiff that *Freire* appears to overly encumber section 75B(1). First, while the language of § 75B(1) is similar to that used in chapter 151B, § 1(16), it is different in one important respect. Unlike section 1(16), section 75B(1) states that certain workers injured on the job "shall be deemed to be" qualified handicapped persons under chapter 151B. It contains no words which even imply that the injury must *also* "substantially impair[ ] a major life activity." *Freire,* supra. The state legislature may well have assumed that an injury sufficient to qualify an individual for workers com-

pensation was sufficient to impair that person's ability to "work," one aspect of a major life activity.

Second, those reported appellate decisions which mention section 75B(1) do not deny that it may provide an expanded definition for the term "qualified handicapped person." *See Dartt*, 691 N.E.2d at 536 n. 30; *Hallgren*, 679 N.E.2d at 259 n. 2. This is true as well for *Everett*, 735 N.E.2d 1271, 2000 WL 1476321, at *5 n. 13 (discussing section 75B(1) as a "[f]urther[ ]" basis for relief under which the plaintiff would be "presumed to be a qualified handicapped person").

Third, the court has located several Superior Court decisions that appear to contradict *Freire*. *See, e.g., Piderit v. Siegal & Sons Investments, Ltd.*, 1998 WL 1181187, at * 3 (Mass.Super.Ct. Aug. 19, 1998) (citing section 75B(1) and stating that "discrimination against an injured but qualified worker on account of his workplace injury is unlawful handicap discrimination"); *Zarrella v. City of Everett*, 1996 WL 1186938, at *2 and n. 2 (Mass.Super.Ct. May 1, 1996) (holding that section 75B(1) "expands the definition of 'qualified handicapped person' to certain employees injured on the job"; "[o]therwise, a 'handicapped person' is defined as any person who has 'a physical or mental impairment which substantially limits one or more major life activities of a person[,]' G.L.c. 151B, § 1(17) and (19)"); *Belonni v. Reservoir Nursing Ctr.*, 1994 WL 879457, at *4 (Mass.Super.Ct. Jan. 18, 1994) (holding that where evidence suggested plaintiff injured on the job was not totally disabled, claim under section 75B(1) survived summary judgment). *See also Rowe v. Town of N. Reading*, 2001 WL 170655, at *6 n. 2 (Mass.Super.Ct. Jan. 5, 2001) (dismissing section 75B(1) alternative definition where plaintiff not injured on the job). *But see Berghuis v. Univ. of Mass. Med. Ctr.*, 1998

WL 1182068, at * 3 (Mass.Super.Ct. Apr. 6, 1998) (stating that section 75B "contains language mirroring the definition of a qualified handicapped person in chapter 151B"). These decisions actually support Plaintiff's reading of the statutes.

Fourth, as Plaintiff points out, guidelines published by the Massachusetts Commission Against Discrimination distinguish between "isolated medical problems . . . and illnesses of short duration [which] usually are not handicaps" under section 151B, and section 75B(1) which deems "individuals who suffer certain on-the-job injuries [as] handicapped individuals for purposes of ch. 151B." (Plaintiff's Brief, Exhibit 7 at 4 and n.3.) In sum, a reasonable jury could conclude that Plaintiff "has sustained a work-related injury and is capable of performing the essential functions of [his] job." Mass.Gen.L. ch. 152, § 75B(1). Thus, in the court's opinion, Plaintiff cannot be excluded as a matter of law, as Defendant would have it, from being a "qualified handicapped person" under chapter 151B.

### c. *Further analysis*

Even though Plaintiff may be deemed to be a "qualified handicapped person," he must also prove at trial that Defendant terminated or otherwise discriminated against him "because of his handicap." Mass.Gen.L. ch. 151B, § 4(16). In this regard, the court will look to the three stage, burden-shifting framework first outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and further explained and refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *See Benham v.*

*Lenox Sav. Bank,* 118 F.Supp.2d 132, 141 (D.Mass.2000). This three-step analysis parallels that applicable to chapter 151B under which Plaintiff brings his cause of action here. *See Fite v. Digital Equip. Corp.,* 232 F.3d 3, 7 (1st Cir.2000) ("In our view, federal and Massachusetts law are now generally aligned on the pretext issue.") (citing *Reeves* and *Abramian v. President and Fellows of Harvard College,* 432 Mass. 107, 731 N.E.2d 1075, 1084–86 (2000)).[8]

At the first stage of the *McDonnell Douglas* analysis, Plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. *See Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 56 (1st Cir.1999), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000). This is easily met: Plaintiff, as indicated, was a qualified handicapped individual at the time of the events at issue; he was able to perform the essential functions of his job with or without reasonable accommodation; he was terminated by Defendant; and the position he had occupied remained open and Defendant sought to fill it. *See Dartt,* 691 N.E.2d at 528.

At the second stage, the burden shifts to Defendant to produce a valid, nondiscriminatory reason for the adverse employment action. *See Thomas,* 183 F.3d at 56. However, neither Plaintiff nor Defendant has specifically argued the point. Defendant, of course, might argue that it fired Plaintiff because he refused to follow an appropriate work-related rule. Still, neither party has gone beyond the first stage of the analysis in the context of Defendant's motion and the court declines to do so as well.[9] Thus, for purposes here, the court will recommend that summary judgment should not enter in Defendant's favor with respect to Plaintiff's claim under section 4(16) of chapter 151B.

2. *Whether a Reasonable Jury Could Conclude that Plaintiff was Terminated for Opposing a Discriminatory Practice or Exercising a Right Afforded by the WCA*

Defendant's second argument is that no reasonable jury could conclude that Plaintiff was terminated for opposing a discriminatory practice. This argument appears to target Plaintiff's claim under section 4(4) of chapter 151B. Implicitly, it also targets Plaintiff's claim under section 75B(2) of chapter 152.

a. *Section 4(4)*

As indicated, it is unlawful "[f]or any ... employer ... to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under ... chapter [151B]." Mass.Gen.L. ch. 151B, § 4(4). As just indicated, see n. 9, the court believes that a reasonable jury could conclude that Plaintiff's firing violated section 4(16) of chapter

---

**8.** Although Plaintiff makes reference to the *McDonnell Douglas* line of cases, (see Plaintiff's Brief at 17), Defendant does not, preferring instead, as described, to put all of its eggs with respect to section 4(16) in its "qualified handicapped person" definitional basket.

**9.** At the third stage of the analysis, if needed, the burden will shift back to Plaintiff to establish by a preponderance of the evidence "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 (citation and internal

quotation marks omitted). In this regard, the court believes that a reasonable jury could conclude that Plaintiff was discriminated against "because of his handicap." Mass. Gen.L. ch. 151B, § 4(16). Plaintiff, along with all other injured employees who returned to work, was discriminated against in a variety of ways. Not only were Plaintiff and the other program participants required to wear orange vests, they received only two-thirds of their regular pay for two weeks and, unlike non-injured workers, had to perform daily exercises.

151B. A reasonable jury could also conclude that Plaintiff was fired "because he ... opposed" this forbidden practice. To be sure, Defendant pointed out at oral argument that Plaintiff, at his deposition, did not specifically say that he was fired because he opposed a discriminatory practice. However, Plaintiff did say that he "was fired because [he] wouldn't put the vest on" which he "refused to wear" because he "didn't feel like being humiliated." (Kennedy Affidavit, Exhibit D at 71–72). In the court's view, Plaintiff's evidence is more than sufficient to overcome Defendant's summary judgment argument with respect to Plaintiff's section 4(4) claim.

b. *Section 75B(2)*

 For similar reasons, the court believes that Defendant is not entitled to summary judgment on Plaintiff's claim under section 75B(2) of chapter 152. As described, that section states that "[n]o employer ... shall discharge ... or in any other manner discriminate against an employee because the employee has exercised a right afforded by this chapter ...." Mass.Gen.L. ch. 152, § 75B(2). Here, Plaintiff contends that a reasonable jury could conclude that he was discriminated against for asserting his workers' compensation rights. As Plaintiff points out, Defendant instituted the Safety Retraining Program in order to reduce costs associated with injury-related claims and, in fact, terminated the employment of around twelve percent of injured workers within a few months. This raises at least a reasonable inference of discrimination in violation of section 75B(2). Indeed, Defendant's memorandum of law never discusses Plaintiff's section 75B(2) claim.

III. CONCLUSION

For the foregoing reasons, the court recommends that Defendant's motion for summary judgment be DENIED.[10]

April 23, 2001.

---

10. The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within ten (10) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v.. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.